Tina Wolfson, CA Bar No. 174806
*twolfson@ahdootwolfson.com*
Robert R. Ahdoot, CA Bar No. 172098
*rahdoot@ahdootwolfson.com*
Theodore Maya, CA Bar No. 223242
*tmaya@ahdootwolfson.com*
Bradley K. King, CA Bar No. 274399
*bking@ahdootwolfson.com*
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111; Fax: (310) 474-8585

[*Additional Counsel on Signature Pages*]

*Class Counsel*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| PHILIP ALVAREZ, RANDALL BETTISON, MARC KELLEHER, and DARLENE VAUGH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SIRIUS XM RADIO INC.,<br><br>Defendant. | Case No. 2:18-cv-08605-JVS-SS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. James V. Selna, presiding<br><br>Date:       January 25, 2021<br>Time:       1:30 PM<br>Location:   Courtroom 10C<br>            411 West 4th Street,<br>            Santa Ana, CA 92701<br><br>See, *lifetimesiriusxmsettlement.com* for attendance details and dial in information for video conference<br><br>[Declarations of Robert Ahdoot and Patrick Donnelly filed concurrently] |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 25, 2021 at 1:30 p.m., in Courtroom 10C of the above-captioned Court before the Honorable James V. Selna, Plaintiffs Philip Alvarez, Randall Bettison, Marc Kelleher, and Darlene Vaugh (collectively, "Plaintiffs") will and hereby do move for an Order Granting Final Approval of Class Action Settlement, pursuant to the Settlement Agreement and Release filed on June 11, 2020. (ECF 68.) Specifically, Plaintiffs seeks an Order:

1.  Approving the proposed Settlement as fair, reasonable, and adequate to Plaintiffs and Class Members, and directing the Settlement's consummation according to its terms;

2.  Certifying the Settlement Class for settlement purposes;

3.  Finding that the form and manner of class notice implemented pursuant to the Settlement: (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the litigation, the terms of the proposed Settlement, the right to object to the proposed Settlement or exclude themselves from the Class, and the right to appear at the Final Approval Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meets the requirements of state and federal due process, the Federal Rules of Civil Procedure, and any other applicable state and/or federal laws;

4.  Finding that all Class Members shall be bound by the Settlement as it relates to the Class in which each is a member, including the release provisions and covenant not to sue;

5.  Directing that judgment be entered dismissing with prejudice all individual and class claims asserted in the litigation and ruling that no costs or fees be assessed on either party other than as expressly provided in the Settlement;

6.      Incorporating the release and related provisions set forth in the Settlement and barring any Released Claims against the Released Parties;

7.      Overruling all objections;

8.      Approving distribution of the benefits to the Class Members consistent with the Settlement; and

9.      Retaining jurisdiction of all matters relating to the interpretation, administration, implementation, and enforcement of the Settlement.

As discussed in the accompanying memorandum, approval of the Settlement and the related relief requested herein is appropriate under applicable law and is well justified under the circumstances of this matter.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Robert Ahdoot (Class Counsel) and Patrick Donnelly (Executive Vice President, General Counsel, and Secretary of Sirius XM), the Settlement Agreement and Release previously filed with the Court (ECF 68), all papers filed in support thereof, and such evidence and argument as the Court may consider.

**NOTE:**      Please check www.lifetimesiriusxmsettlement.com prior to the hearing for attendance procedures, including details regarding dial in information via video conference.

1  Dated: December 18, 2020

2

Respectfully Submitted,
**AHDOOT & WOLFSON, PC**

3

By:    */s/ Robert Ahdoot*

4

Tina Wolfson
*twolfson@ahdootwolfson.com*

5

Robert Ahdoot
*rahdoot@ahdootwolfson.com*

6

Theodore W. Maya

7

*tmaya@ahdootwolfson.com*
Bradley K. King

8

*bking@ahdootwolfson.com*

9

2600 West Olive Avenue, Suite 500

10

Burbank, California 91505
Tel: (310) 474-9111; Fax: (310) 474-8585

11

12

Cornelius P. Dukelow
(admitted *pro hac vice*)

13

*cdukelow@abingtonlaw.com*

14

**ABINGTON COLE + ELLERY**
320 S. Boston Avenue, Suite 1130

15

Tulsa, Oklahoma 74103

16

Telephone & Facsimile: (918) 588-3400

17

Keith S. Dubanevich

18

(admitted *pro hac vice*)
*kdubanevich@stollberne.com*

19

**STOLL STOLL BERNE LOKTING & SHLACHTER**

20

**P.C.**
209 SW Oak Street, Suite 500

21

Portland, Oregon 97204

22

Telephone: (503) 227-1600
Facsimile: (503) 227-6840

23

24

*Attorneys for Plaintiffs and Class Counsel*

25

26

27

28

iii                    Case No. 2:18-cv-08605-JVS-SS

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................. 1

II. BACKGROUND .............................................................................................. 3

    A. Factual and Procedural History ............................................................. 3

    B. The Parties Engaged in Extensive Settlement Negotiations ......................... 4

    C. Preliminary Settlement Approval and Dissemination of Notice ................... 6

III. THE SETTLEMENT ......................................................................................... 7

    A. The Settlement Class ............................................................................ 7

    B. The Settlement Confers Substantial Benefits to Class Members ................. 8

    C. Opt-Outs & Objections ......................................................................... 9

    D. Payment of Settlement Administration Expenses, Service Payments,

       and Attorneys' Fees and Expenses ...................................................... 10

    E. Release .............................................................................................. 10

IV. NOTICE WAS SUCCESSFULLY DISSEMINATED PURSUANT TO THE

    COURT-APPROVED NOTICE PLAN ......................................................... 10

V. THE RESPONSE FROM THE CLASS IS OVERWHELMINGLY POSITIVE . 11

VI. THE COURT SHOULD GRANT FINAL APPROVAL OF

    THE SETTLEMENT ..................................................................................... 12

    A. The Class Action Settlement Approval Process ...................................... 12

    B. Final Approval of the Settlement is Appropriate .................................... 12

       1. The Strength of Plaintiffs' Case and the Risk, Expense, Complexity,

          and Likely Duration of Further Litigation Weigh in Favor of

          Settlement ................................................................................... 13

       2. Plaintiffs Face the Challenge of Maintaining Class Action Status

          Leading up to and Through Trial ................................................... 14

       3. The Benefits Conferred by the Settlement are Substantial ................ 15

       4. Class Counsel Performed Sufficient Discovery, Research, and

          Analysis to Adequately Assess the Settlement and the Strengths and

          Weaknesses of the Class's Claims ................................................ 15

       5. The Recommendations of Experienced Class Counsel Favor Final

          Approval .................................................................................... 16

       6. No Presence of a Government Participant ...................................... 17

       7. The Class Response Favors Final Approval .................................... 17

       8. Lack of Collusion Between the Parties .......................................... 18

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS
## (continued)

Page

VII. THE OBJECTIONS ....................................................................... 19

    A.   The Small Number of Objections – Five – Is Compelling Evidence that the Settlement Is Fair, Reasonable, and Adequate ...................................... 19

    B.   The Objections Are Without Merit And Should Be Overruled ................. 20

        1.   Objections That The Settlement Is Somehow Inadequate Have No Merit Because The Settlement's Benefits Are Excellent And Certainly Fair, Reasonable, And Adequate ........................................ 20

        2.   Notice To The Class Satisfies Due Process, the FRCP, And Was Executed In Accordance With The Court's Order ............................ 24

        3.   The Requirements for Objecting Are Fair........................................ 25

VIII. CLASS ACTION TREATMENT IS APPROPRIATE FOR THIS SETTLEMENT ....................................................................... 26

    A.   This Action Satisfies the Requirements of Rule 23(a) ............................... 26

        1.   The Class is Sufficiently Numerous.................................................. 26

        2.   There Are Common Questions of Both Law and Fact...................... 27

        3.   The Class Representatives' Claims Are Typical of Other Class Members' Claims ........................................................................... 27

        4.   Class Representatives and Class Counsel Fairly and Adequately Protect the Interests of the Class ...................................................... 27

    B.   The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied ................................................................................................... 28

        1.   Common Issues of Law and Fact Predominate ................................ 29

        2.   Class Treatment Is Superior in This Case ........................................ 29

IX.  CONCLUSION ................................................................................. 30

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
<u>Cases</u>

4
*Amador v. Baca*, No. 2:10-cv-1649-SVW-JEM,

5
    2020 WL 5628938 (C.D. Cal. Aug. 11, 2020)............................................................. 24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)..................... 29

6
*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).................................. 26

7
*Browne v. Am. Honda Motor Co.*, No. 09-cv-06750-MMM-DTB,

8
    2010 WL 9499072 (C.D. Cal. July 29, 2010)............................................................. 23

9
*Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-cv-09405-CAS,

    2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ............................................................... 23

10
*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012)........................ 28

11
*Garner v. State Farm Mut. Auto. Ins. Co.,* No. 08-cv-1365-CW,

12
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ............................................................ 18

13
*Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068-MMC, 2007 WL 221862

    (N.D. Cal. Jan. 26, 2007), *aff'd,* 331 F. App'x 452 (9th Cir. 2009) .......................... 23

14
*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................. 18

15
*In re Heritage Bond Litig.*, No. 02-ml-1475-DT,

    2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................................................... 18

16
*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ................................. 15

17
*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD,

18
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013).............................................................. 12

19
*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)......................... 19

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) .................................................. 23

20
*Mandujano v. Basic Vegetable Prods. Inc.*, 541 F.2d 832 (9th Cir. 1976)................... 19

21
*Milligan v. Toyota*, No. 3:09–cv–05418–RS (N.D. Cal. Jan. 6, 2012) ......................... 24

22
*Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA,

    2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ........................................................... 19

23
*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*

24
    221 F.R.D. 523 (C.D. Cal. 2004) ....................................................................... 17, 19

25
*Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482 (C.D. Cal. 2006).............. 30

*Officers for Justice v. Civil Service Com'n of City and County of S.F.*,

26
    688 F.2d 615 (9th Cir. 1982) ................................................................................... 13

27
*Palmer v. Stassinos*, 233 F.R.D. 546 (N.D. Cal. 2006)................................................ 27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014)..............................................................27

*Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA,
 2013 WL 5402120 (N.D. Cal. Sept. 26, 2013) ..............................................................18

*Richie v. Blue Shield of Cal.*, No. 13-cv-2693-EMC,
 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)..................................................................26

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010)......................................................27

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ...................... 13, 17

*Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI-JLT
 (E.D. Cal. July 21, 2015) ................................................................................................18

*Slaven v. BP Am., Inc.*, 190 F.R.D. 649 (C.D. Cal. 2000)..............................................26

*Spalding v. City of Oakland*, No. C11-2867 TEH,
 2012 WL 994644 (N.D. Cal. Mar. 23, 2012)..................................................................27

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)......................................................13

*Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th Cir. 2014).............27

### Statutes

28 U.S.C. § 1715 ...............................................................................................................17

### Rules

Fed. R. Civ. P. 23(a).................................................................................................. 26, 28
Fed. R. Civ. P. 23(b).................................................................................................. 29, 30

### Treatises

4 Newberg on Class Actions, § 11:22 ..............................................................................12
4 Newberg on Class Actions, § 11:41 ..............................................................................18
4 Newberg on Class Actions, § 11:50 ..............................................................................13
Manual for Complex Litigation (Fourth) §§ 21.63 *et seq.* (Fed. Jud. Center 2004) .....12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs respectfully seek final approval of the preliminarily approved class action Settlement, which if approved resolves claims alleged in a number of class actions against Defendant Sirius XM Radio Inc. ("Sirius XM"). These actions result from Sirius XM's sale of "Lifetime Subscriptions" to its satellite radio service, which lasted not for the lifetime of the consumers who purchased them (as plaintiffs alleged they should have done), but for the lifetime of the particular Device such consumers first used to receive the service and, up to three more Devices thereafter with a $75 transfer fee for each transfer between Devices (which Sirius XM asserts was consistent with its marketing and written subscriber agreement over the years).

The Settlement achieves a "Lifetime Subscription" for Settlement Class Members ("Class Members") that can actually last for their lifetime, as opposed to a maximum to the lifetime of four Devices. (Settlement Agreement ("SA") ¶¶ 66-68.) Pursuant to the Settlement, Class Members with Active Lifetime Subscriptions will be able to transfer them to an unlimited number of different Devices, for a charge of $35 per transfer (a significant reduction from Defendant's $75 per transfer fee). (*Id.* ¶ 66(a).)

Some Class Members no longer have Active Subscriptions. Those Class Members will have the option of reactivating their  Lifetime Subscriptions (at no charge) and receive the benefits described above, or claiming $100 in cash. (*Id.* ¶ 67.) Finally, and in addition, Internet streaming of Sirius XM's radio service will be made available to Inactive Lifetime Subscribers who choose to reactivate, with no additional fee paid to Sirius XM (Internet streaming is already available to Active Lifetime Subscribers at no additional fee paid to Sirius XM). (*Id.* ¶ 66(c).)

Plaintiffs' expert, Christian Tregillis, opines that the Settlement's benefits are worth approximately $96.4 million. (Declaration of Christian Tregillis ("Tregillis Decl."), ECF 69-9 ¶ 35.) The terms of this Settlement are not only fair, reasonable, and adequate, as required for approval under the Federal Rules, but represent an achievement

that most likely is better than any result Plaintiffs could hope to achieve through continued litigation of these actions, were they to certify a class and make it to trial before a court — no mean feat, particularly given that this Court previously compelled the earliest filed of these actions to individual arbitration under the terms of Defendant's alleged subscriber agreement. *See Wright v. Sirius XM Radio, Inc*., No. 16-01688 JVS ("*Wright*"), ECF 59.

The Settlement was achieved after four years of hard-fought litigation, in this Court on behalf of Plaintiffs Alvarez and Wright (in this Action and in *Wright*), as well as in two other trial courts on behalf of Plaintiffs Bettison and Vaugh, and in the Ninth Circuit Court of Appeals after Wright appealed this Court's order compelling individual arbitration of his claims. The Settlement is the result of extensive arms'-length negotiations overseen by Judge Carl West (Ret.), a respected and experienced JAMS mediator and former California Superior Court Judge.

The Court preliminarily approved the proposed Settlement and the Settlement's proposed Notice Plan on July 15, 2020. (Order Regarding Motion for Preliminary Approval of Class Action Settlement ("Prelim. App. Order"), ECF 75.) Notice was successfully disseminated to Class Members who had an overwhelmingly positive reaction to the Settlement. By this Motion, Plaintiffs respectfully request that the Court conduct a final review of the Settlement, and approve the Settlement as fair, reasonable, and adequate.[1]

The Settlement Administrator has implemented the robust, multi-pronged Notice Plan, and the user-friendly claims process which the Court approved.

The reaction from Class Members is resoundingly positive. As of December 11, 2020, 6,210 Class Members with Inactive Subscriptions (and thus eligible to submit Claims) submitted Claim Forms (the Claims Deadline is January 12, 2021). (*See* concurrently filed Declaration of Robert Ahdoot ("Ahdoot Decl.") ¶ 8.) In contrast, out

---

[1]     Unless otherwise specified herein, all capitalized terms and phrases have the same meaning as in the Definitions, Section II, of the Settlement Agreement. (ECF 68.)

of the hundreds of thousands of potential Class Members (98.3% of whom Epiq successfully delivered Notice to), only 37 persons opted out and there were only 5 objections.

For the foregoing reasons and the others detailed below, the Settlement meets the standards for final settlement approval and should be approved.

## II.   BACKGROUND

### A.   Factual and Procedural History

The proposed Settlement resolves three separate class action lawsuits against Sirius XM under the captions *Vaugh v. Sirius XM Radio Inc.*, No. 1:18-cv-10331-NLH-AMD (D.N.J.) ("*Vaugh*"), *Alvarez v. Sirius XM Radio Inc.*, No. 2:18-cv-08605-JVS-SS (C.D. Cal.) ("*Alvarez*"), and *Bettison v Sirius XM Radio Inc*., 3:18-cv-01065-PK (D. Or.) ("*Bettison*"), as well as the individual claim of Wright in the fourth class action entitled *Wright v. Sirius XM Radio Inc*., No. 8:16-cv-01688-JVS-JCG (C.D. Cal.) ("*Wright*"), which was dismissed by the Court of Appeals at oral argument when the Parties announced the Settlement.[2]

Wright, filed the earliest of the actions in this Court. In response, Sirius XM filed a motion to compel arbitration under the terms of Sirius XM's subscriber agreement (*see e.g.* Declaration of Catherine Petras ("Petras Decl."), Ex. A, Customer Agreement (*Wright*, ECF 32-3). After two rounds of briefing, the Court granted the motion to compel arbitration and dismissed the *Wright* matter without prejudice so as not to adversely affect an arbitration. (*Wright*, ECF 59.) The Court also denied leave to amend the complaint to add additional class representatives because the addition of "new class representatives would not change the result." (*Id.*)  The Customer Agreement enforced by this Court also contained the following provisions regarding programming and transfer fees:

---

[2]    For a detailed account of the factual and procedural history of this matter and the work performed by Class Counsel, *see* Motion for Preliminary Approval, ECF 69; Motion for Attorneys' Fees, ECF 83 and supporting Declaration of Robert Ahdoot ("Ahdoot Fee Decl."), ECF 83-1, all of which are incorporated by reference.)

1.   **GENERAL.**

**a)   Programming.** The Service consists of a wide variety of music, sports, news, talk, children's and other entertainment programming. Many different and changing considerations affect the availability, cost and quality of programming and customer demand for it. Accordingly, we reserve the unrestricted right to change, rearrange, add, or delete programming, including canceling, moving or adding particular channels, and our prices, at any time, with or without notice to you. … If you do not cancel your Subscription within 30 days of a change, your continued receipt of the Service will constitute your acceptance of such changes.

**4. Transfer Fee:** If you wish to transfer your Subscription to a different SIRIUS Receiver during the term of a prepaid subscription or committed subscription period, we may charge you a transfer fee of up to $75.00.

(Petras Decl., Ex. A (*Wright* ECF 32-3); *see also*, *id.* Exs. D, I, & F (*Wright* ECF 32-6, 32-8, & 32-11) and Declaration of Patrick Donnelly filed concurrently herewith ("Donnelly Decl."), Exs. A - E (various versions of Sirius XM's Customer Agreement all of which contain the same or substantially similar provisions).

## B.   The Parties Engaged in Extensive Settlement Negotiations

In Spring of 2017, counsel for Plaintiff Wright began exploring the possibility of resolution and engaging a mediator. The Parties held an in-person settlement conference with counsel for Sirius XM at the Jones Day office in New York, but despite a number of follow up conversations, a resolution did not occur at that time. (Ahdoot Fee Decl. ¶ 22.) Nevertheless, these initial conversations laid the groundwork for future resolution discussions, and Plaintiffs' Counsel expended significant time and resources during the initial talks, including hard-fought negotiation of informal discovery and review of the documents Sirius XM agreed to produce pursuant to those resolution efforts. (*Id.* ¶ 23.)

On June 28, 2017, shortly before Plaintiffs Alvarez, Bettison, and Vaugh filed their cases, Plaintiff Wright appealed this Court's order granting Defendant's motion to dismiss and to compel arbitration of his claims. (9th Cir. Case No. 17-55928 (the "Appeal").) Thereafter, the Parties filed their opening, response, and reply briefs in the Appeal. (*Id.* ECF 11, 21, 23.) While that appeal and the other Plaintiffs' claims were pending, and after all briefing in the Appeal was submitted, on November 29, 2018, the

Parties participated in a full-day mediation session before the Honorable Carl J. West (Ret.). (Ahdoot Fee Decl. ¶ 28.)

At Plaintiffs' counsel's request, Defendant provided substantial information in advance of mediation, sufficient to enable Plaintiffs' counsel to value the claims and damages and understand the prospective Class's composition. (*Id.* ¶ 29.) This information, and the Parties' prior investigations, litigation, and briefing, gave Plaintiffs' counsel an understanding of the claims and defenses sufficient to meaningfully conduct informed settlement discussions. (*Id.*)

The Settlement was not reached at the November 29, 2018 mediation. (*Id.* ¶ 31.) Nonetheless, with the continued assistance of Judge West, after protracted and lengthy negotiations, and on the morning of the oral argument before the Ninth Circuit in the Appeal (after the Parties had checked in), on December 5, 2018, the Parties were able to reach an agreement in principle. (*Id.* ¶ 32.) Accordingly, Plaintiff Wright moved to dismiss his appeal at oral argument, and the Ninth Circuit did not rule on the appeal. (9th Cir. Case No. 17-55928, ECF 38.)

The Parties then engaged in additional and extensive months-long negotiations, through many telephone conferences, to finalize and memorialize all aspects of the Settlement Agreement, including each of its many exhibits. (Ahdoot Fee Decl. ¶ 33.)

Even though Sirius XM is paying for Settlement administration in addition to the benefits made available to the Class, the Parties held a competitive bidding process to procure claims administration estimates from well-known administration companies, at the conclusion of which the Parties selected Epiq Class Action & Claims Solutions, Inc. ("Epiq"). (*Id.* ¶ 37.) The notice program and each document comprising the notice were extensively negotiated and exhaustively refined, with input from experts at Epiq, to make them easy to read and understand. (*Id.* ¶¶ 37-38; Declaration of Cameron Azari filed on June 11, 2020, ECF 68-5.)

In addition to the Named Plaintiffs and Paul Wright, Class Counsel also communicated the Settlement's terms to all of their many clients, who unanimously

expressed support. (Ahdoot Fee Decl. ¶ 40.) On June 5, 2020, after months of negotiations, the Parties executed the Settlement Agreement. (*Id.* ¶ 41.) At all times during settlement discussions, the negotiations were at arms' length. Furthermore, it was always the Named Plaintiffs' and Class Counsel's primary goal to achieve the maximum substantive relief possible for the Class.

### C.  Preliminary Settlement Approval and Dissemination of Notice

On June 11, 2020, Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement ("Motion for Preliminary Approval"), which included supporting documents, declarations, and exhibits. (ECF 69.) As discussed therein, in light of the fact that this Court ordered the matter to individual arbitration, the risk and uncertainty of the merits of the claim and class certification, and continued litigation, the Settlement is an outstanding result for the Settlement Class.

On July 15, 2020, the Court preliminarily approved the Settlement and ordered that the Class be given Notice. (Prelim. App. Order, ECF 75.) After the Court preliminarily approved the Settlement, the Parties continued to work with the Settlement Administrator to supervise dissemination of Notice to Class Members. (Ahdoot Fee Decl. ¶ 43.) These efforts included review and drafting of the language and format of the Settlement Website, the script for the automated response to the toll-free number, the language and format of the Settlement Class Notice forms, monitoring for exclusion requests and objections, and ensuring prompt response to each and every Class Member inquiry (whether by phone or e-mail) regarding the Settlement. (*Id.*)

Notice was successfully disseminated pursuant to the plan approved by the Court. As of December 10, 2020, a Postcard Notice or an Email Notice was delivered to 838,772 Class Members. (Declaration of C. Azari on Implementation and Adequacy of Settlement Notice Plan ("2nd Azari Decl."), ECF 85 ¶¶ 10-18.) Epiq also successfully completed an Internet notice campaign (*id.* ¶¶ 19-20), the Settlement Website, toll-free number, and postal mailing address (*id.* ¶¶ 21-23).  Individual direct notice and the

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

internet campaign resulted in a notice of reach of approximately 98.3% of the identified Class Members. (*Id.* ¶¶ 8, 13, 31.)

## III.   THE SETTLEMENT

The Settlement provides substantial benefits to Class Members in exchange for the Release and is summarized below.[3] (SA ¶¶ 66, 83-87.)

### A.   The Settlement Class

The Settlement Class is defined as:

> All Persons in the United States who purchased a paid subscription from Sirius XM (or one of its predecessors) that was marketed as a "lifetime plan" or "lifetime subscription." Excluded from the Class are: Sirius XM and its parents, subsidiaries, or any entities in which it has a controlling interest, as well as Sirius XM's officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judges to whom this case is assigned as well as their judicial staff and immediate family members.

(Prelim. App. Order, ECF 75 at p. 2; SA ¶ 33.)

The Settlement Class consists of hundreds of thousands of individuals. As of the execution date of the Settlement Agreement, there are approximately 838,000 Active Lifetime Subscriptions[4] ("Active Subscribers"), and approximately 126,000 Inactive Lifetime Subscriptions[5] ("Inactive Subscribers"). (SA ¶¶ 2, 19; *see also* SA Section I, Recitals.)

---

[3]    A more detailed description of the Settlement is set forth in the Preliminary Approval Motion (ECF 69) is incorporated herein.

[4]    An Active Lifetime Subscription is a Lifetime Subscription that, according to Sirius XM's records, is associated with a Device that was activated to receive Sirius XM's satellite radio service prior to June 5, 2020 and that continues to be authorized to receive the Sirius XM satellite delivered radio service. (SA ¶ 2.)

[5]    An Inactive Lifetime Subscription is a Lifetime Subscription that, according to Sirius XM's records, as of June 5, 2020, is no longer associated with a Device that was activated to receive Sirius XM's satellite delivered radio service. A Settlement Class Member who previously had a Lifetime Subscription, but whose Lifetime Subscription was converted to a yearly, monthly, or some other subscription is deemed to have an Inactive Lifetime Subscription. (SA ¶ 19.)

## B. The Settlement Confers Substantial Benefits to Class Members

Under the Settlement, Sirius XM agrees to: (1) allow Inactive Subscribers to reactivate their Lifetime Subscriptions at no charge;[6] (2) allow Active Subscribers and Inactive Subscribers who have opted to reactivate their account (pursuant to this Settlement) to transfer their Lifetime Subscriptions to other Devices an *unlimited* number of times; (3) not charge more than $35 for any transfer of a Lifetime Subscription to other Devices (a reduction of the current fee of $75 per transfer), and (4) provide Inactive Subscribers who choose to reactivate with access to Sirius XM's Internet streaming service at no cost (this feature is currently available to Active Lifetime Subscribers). Inactive Subscribers may choose to forgo the relief above and, instead, be paid a $100 cash payment. Sirius XM has also agreed to pay for the costs of the settlement notice and administration, court-approved attorneys' fees and expenses up to $3.5 million, and Service Payments for each Named Plaintiff and Paul Wright[7] up to $5,000 each. (SA ¶¶ 45, 76-78.)

Active Subscribers will receive the benefits of the Settlement automatically. In the event an Active Subscriber does not opt out, then he or she will be subject to the releases set forth in the Settlement.

Inactive Subscribers must submit a Claim Form to obtain the Settlement's benefits (i.e. reactivation of the Lifetime Subscription or a $100 payment). (*Id.* ¶ 68(a) and Ex. A (Claim Form).) Claim Forms may be submitted on-line (through the Settlement Website) or by mail through January 12, 2021. In the event an Inactive Subscriber does not submit a Claim Form, and does not opt out, then he or she will be subject to the

---

[6]     Inactive Lifetime Subscribers who elect to cancel another paid Sirius XM subscription at no charge when they reactivate their Lifetime Subscription will receive a *pro rata* refund of any amounts paid for future service unless such paid subscription purchased included bundled equipment. (SA ¶ 66(c)(i); Ex. B (Long Form Notice FAQ 8).)

[7]     Pursuant to the Motion to Compel Arbitration, Wright was ordered to individual arbitration. (*Wright*, ECF 59.) He dismissed the appeal from this Order after the material settlement terms were reached. Rather than pursuing arbitration, however, Wright will participate in the Settlement, albeit not as a Class Representative. In addition to the Settlement, Wright also agreed to a Covenant Not to Sue Sirius XM. (SA ¶ 91, Ex. H.)

releases set forth in the Settlement. Class Members have been provided an opportunity to determine whether they have either Inactive Lifetime Subscriptions or Active Lifetime Subscriptions (as of the Settlement date) *via* a link on the Settlement Website's landing page entitled "Verify Account". (*Id.* ¶ 51.)

Defendant offered Lifetime Subscriptions for prices ranging from $357.54 to $755.00. (Ahdoot Fee Decl. ¶ 29; Tregillis Decl. ¶ 21 & Ex. B.) Given their relatively high cost and value, the value of each Lifetime Subscription that no longer expires, or that is reactivated, pursuant to the terms of the Settlement, is significant. (Tregillis Decl. ¶¶ 18-36.) In addition, the reduction of the Device transfer fee from $75 to $35 – for at least the approximately 838,000 active accounts (and the reactivating Inactive Subscribers) – increases the value of the Settlement significantly. Factoring all these data points, Plaintiffs' expert values the Settlement's benefits at $96.4 million (this valuation does not include any amounts paid for Notice and Administration, Service Payments, and Attorneys' Fees and Expenses, all of which are to be paid by Sirius XM in addition to benefits described above). (Tregillis Decl. ¶ 35.)

## C.   <u>Opt-Outs & Objections</u>

Class Members were provided an opportunity to opt out of, or object to, the Settlement by doing so on or before November 30, 2020. (Prelim. App. Order, ECF 75 at 15.) Valid requests required information described in the Notice. (2ⁿᵈ Azari Decl., Ex. 4.) Class Members also were informed that they could object to the Settlement, and informed about Class Counsel's fee application and the requests for Service Payments. (*Id.*, Exs. 3 & 4.) To be considered, a written, personally-signed objection had to be mailed to the Settlement Administrator, Class Counsel, Defense Counsel, and the Court to the addresses listed in the Notice and had to include the information prescribed by the Notice. (SA ¶ 60; 2ⁿᵈ Azari Decl., Ex. 4.) Epiq reports that, as of December 10, 2020, 37 Class Members submitted valid requests for exclusion from the Class and 5 objections to the Settlement. (2ⁿᵈ Azari Decl. ¶¶ 24-25.)

### D. <u>Payment of Settlement Administration Expenses, Service Payments, and Attorneys' Fees and Expenses</u>

Class Counsel filed an application for an award of reasonable attorneys' fees and costs on November 16, 2020. (Plaintiffs' Motion For Attorneys' Fees and Expenses and for Service Payments ("Fee & Service Payment Motion"), ECF 83.) Class Counsel requested attorneys' fees in the amount of $3,470,984.63, plus reimbursement of $29,015.37 in litigation expenses.[8] The Fee & Service Payment Motion also requested Service Payments of $5,000 for each of the Class Representatives and Paul Wright. (*Id.*)

### E. <u>Release</u>

If the Settlement is approved, Plaintiffs, Mr. Wright, and only Class Members who do not timely opt out or request exclusion from the Settlement Class will release Sirius XM from all claims "(a) that were asserted, or attempted to be asserted, or that could have been asserted, based on the facts alleged in the Cases, the Action and/or the Consolidated Class Action Complaint, or (b) that arise out of, relate to, or are in connection with the sale of Sirius XM's Lifetime Subscriptions, whether arising out of common law, state law, or federal law, whether by Constitution, statute, contract, common law, or equity, or (c) that arise out of, relate to, or are in connection with the administration of the Settlement (the "Released Claims")." (SA ¶ 83.) Thus, the release is limited and tailored only to apply to allegations in the actions.

## IV. NOTICE WAS SUCCESSFULLY DISSEMINATED PURSUANT TO THE COURT-APPROVED NOTICE PLAN

Rule 23 of the FRCP directs that the best notice practicable under the circumstances must include "individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23. The Court-approved Notice Plan as designed and implement satisfied this requirement.

Class Members who were reasonably identifiable from the Defendant's records received Notice via an Email Notice or a Postcard Notice mailed via United States Postal

---

[8] Sirius XM agreed to separately pay for any and all Settlement Administration Expenses, Service Payments, and Attorneys' Fees and Expenses. (SA ¶ 66(g).) Such payments will not reduce any of the benefits available to the Class.

Service ("USPS") first class mail. (2nd Azari Decl. ¶ 7.) A Postcard Notice was mailed via USPS first class mail to all undeliverable Email Notices (with a physical mailing address) after several attempts to deliver the Email Notice. Overall, individual Notice reached approximately 98.3% of the Settlement Class. (*Id.* ¶¶ 7-8.)

Both individual mailed notice and email notice referred Class Members to the Settlement Website, at LifeTimeSiriusXMSettlement.com. There, Class Members are able to review the Long Form Notice, submit a claim, determine whether their Lifetime Subscription is Active or Inactive as of the date of the Settlement Agreement (*i.e.* June 5, 2020), review key filings from the case docket (including all briefing regarding Settlement approval, attorneys' fees, and the Court's orders thereon), and review the answers to Frequently Asked Questions (FAQs). (*Id.* ¶¶ 12, 21.) The toll-free number also provided Settlement-related information. (*Id.* ¶ 21.) Altogether, the Notice Plan reached approximately 98.3% of potential Class Members. (*Id.* ¶¶ 8, 13, 31.) Finally, the requirements of 28 U.S.C. §1715 ("CAFA") were met. (*Id.* ¶ 9 & Ex. 1.)

## V.   THE RESPONSE FROM THE CLASS IS OVERWHELMINGLY POSITIVE

The deadline for Class Members to opt-out or object to the Settlement was November 30, 2020. As of December 10, 2020, only 37 persons submitted valid requests for exclusion from the Settlement and a total of 5 objections. Together, these individuals represent a minuscule percentage (far less than 1%) of the Class. By contrast, as of December 11, 2020, 6,210 Claim Forms were submitted by Class Members with Inactive Lifetime Subscriptions. (Ahdoot Decl. ¶ 8.) As of December 10, 2020, there have been 101,182 unique visitors to the Settlement website and 386,874 website pages presented. (2nd Azari Decl. ¶ 21.) Moreover, Class Counsel have communicated with numerous Class Members who contacted Class Counsel with questions regarding the Settlement: all such individuals expressed support for the Settlement. (*Id.* ¶ 22; Ahdoot Decl. ¶¶ 7,9.) In addition, as of December 10, 2020, the toll-free number has handled 11,243 calls representing 37,663 minutes of use, and Epiq has received 220 pieces of correspondence

and 5,097 emails. (2nd Azari Decl. ¶¶ 22-23.) Out of all of these individuals, only 37 persons opted out and 5 objected. Thus, Class Members supported this Settlement in overwhelming numbers.

## VI.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A.   The Class Action Settlement Approval Process

Proceedings under Federal Rule of Civil Procedure 23 have led to a defined three-step procedure for approval of class action settlements:

> (1)   Certification of a settlement class and preliminary approval of the proposed settlement after submission to the Court of a written motion for preliminary approval.

> (2)   Dissemination of notice of the proposed settlement to the affected class members.

> (3)   A formal fairness hearing, or final settlement approval hearing, at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

Manual for Complex Litigation (Fourth) §§ 21.63 *et seq*. (Fed. Jud. Center 2004). This procedure safeguards Class Members' procedural due process rights and enables the Court to fulfill its role as guardian of class interests. 4 Newberg on Class Actions, § 11:22 *et seq*. (4th ed. 2002) (hereinafter "Newberg").

The Court completed the first step in the settlement approval process when it issued the Preliminary Approval Order on July 15, 2020 (Prelim. App. Order, ECF 75), and the second step—dissemination of Notice to Class Members—has been implemented by the Settlement Administrator. (2nd Azari Decl. ¶¶ 10-25.) By this Motion, Plaintiffs respectfully request that the Court take the third and final step and grant final approval of the Settlement.

### B.   Final Approval of the Settlement is Appropriate

Public policy "strong[ly] . . . favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).

In weighing final approval of a class settlement, the Court's role is to determine whether the settlement, taken as a whole, is fair, reasonable, and adequate. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The Ninth Circuit has established a list of factors to consider when assessing whether a proposed settlement is fair, reasonable and adequate: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the benefits offered in the settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Churchill Village*, 361 F.3d at 575; *Hanlon*, 150 F.3d at 1026. Application of these factors here supports the conclusion that the Settlement is fundamentally fair, reasonable, and adequate, and should be finally approved.

### 1. The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation Weigh in Favor of Settlement

When evaluating the strength of a plaintiff's case, a court should assess the plaintiff's likelihood of success on the merits and the range of possible recovery. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 964-965 (9th Cir. 2009). The Court is not required to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Service Com'n of City and County of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

The Settlement here appropriately balances the costs, risks, and likely delay of further litigation, on the one hand, against the benefits provided, on the other hand. 4 Newberg § 11:50 at 155 ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."). While Plaintiffs are confident in the strength of their claims, they also recognize that they would have to overcome significant obstacles to succeed.

Here, the Class faced the very real possibility that Sirius XM's arbitration agreements and class action waivers would be found valid and enforceable. Had the case continued in litigation, Sirius XM's arbitration policy and class action waiver likely would have prevented Class Members from proceeding in court, or as a class action, effectively eliminating the possibility of any comparable result. Because the case could perish, as demonstrated by this Court's ruling that compelled the earliest filed of these actions to individual arbitration under the terms of Sirius XM's alleged subscriber agreement (*Wright*, ECF 59 & ECF 32-3, Petras Decl. Ex. A), Class Counsel's achievement on behalf of the Class is extraordinary.

Moreover, various subscriber agreements produced by Sirius XM – which were allegedly applicable to many members of the putative Class alleged in the Complaint - contained provisions that the Lifetime Subscriptions were limited to the lifetime of the initial Device and three transfers, as opposed to the lifetime of the subscriber. (*See e.g.* Petras Decl., Ex. A (*Wright* ECF 32-3); Donnelly Decl. Exs. A - C). While Plaintiffs would have, *inter alia*, argued against the applicability of such provisions, given the allegedly uniform marketing regarding Lifetime Subscriptions, such contractual provisions were likely to provide Sirius XM possible strong defenses to the actions.

Given the heavy obstacles and inherent risks Plaintiffs face with respect to their claims and even getting to trial — the substantial benefits the Settlement provides favor its approval.

### 2. Plaintiffs Face the Challenge of Maintaining Class Action Status Leading up to and Through Trial

If litigation continues in this Court, Defendants will dispute that common issues of fact and law prevail for class certification, and that a class trial is manageable. While Plaintiffs believe they have a strong argument for certifying litigation classes here, obtaining and maintaining class action status leading up to and throughout the trial is always a challenge, and is far from guaranteed in a complex case like this one.

### 3.  The Benefits Conferred by the Settlement are Substantial

Through this Settlement, Class Members will get substantial benefits from the Lifetime Subscriptions Plaintiffs always contended they were owed. Active Subscribers, as well as those Inactive Subscribers who choose to reactivate those subscriptions, will be able to transfer their Lifetime Subscriptions to different Devices an unlimited number of times, at a reduced price of $35, which is less than half of the $75 Defendant currently charges for the three transfers it allows under its current alleged terms and conditions.

In contrast to zero, which is what Class Members well might receive had the case continued to litigation, Plaintiffs' expert opines that the Settlement's benefits are worth approximately $96,400,000. (Tregillis Decl. ¶ 35.) This demonstrates the extraordinary nature of the relief provided to the Class under this Settlement. Accordingly, this factor weighs heavily in favor of final approval.

### 4.  Class Counsel Performed Sufficient Discovery, Research, and Analysis to Adequately Assess the Settlement and the Strengths and Weaknesses of the Class's Claims

This factor evaluates whether the parties have sufficient information to make an informed decision with respect to the settlement. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). "In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining table." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 257 (N.D. Cal. 2015) (internal quotation omitted). "Rather, the court's focus is on whether the parties carefully investigated the claims before reaching a resolution." *Id.* (internal quotation omitted).

This factor weighs heavily in favor of approving the Settlement here. As explained in more detail in the Motion for Attorneys' Fees and Expenses (ECF 83) and supporting Declaration of Robert Ahdoot (ECF 83-1), Class Counsel conducted extensive factual investigation in this matter, including, *inter alia*: significant pre-filing investigations, which included detailed review and evaluation of the facts, including a thorough and exhaustive investigation of issues related to Sirius XM's representations, advertising,

marketing, business practices, and promotional efforts and comprehensive research and analysis of the applicable law, including those relating to Sirius XM's arbitration provisions. (Ahdoot Fee Decl. ¶ 12.) Class Counsel interviewed, and conducted a detailed vetting of hundreds of affected Class Members, with whom they communicated throughout the course of the litigation. (*Id.* ¶ 13.) In all phases of the litigation, Class Counsel endeavored to gain an ample understanding of the legal issues underlying Plaintiffs' claims. (*Id.* ¶ 14.)

The breadth of information gleaned from their extensive discovery and investigation efforts allowed Class Counsel to weigh the likely success of Plaintiffs' claims and estimate individual damages associated with Plaintiffs' claims. (*Id.* ¶ 15.) This necessary work also allowed Class Counsel to proceed forward in a collaborative manner and formulate a litigation strategy aimed at obtaining meaningful relief for the Class as efficiently as possible. (*Id.* ¶ 16.) Although the *Wright* action did not proceed far into the discovery period, given this Court's ruling on Defendant's Motion to Dismiss and to Compel Arbitration, that action was intensely litigated in this Court and in the Ninth Circuit before the Settlement finally was reached. Ultimately, Defendant disclosed substantial evidence under mediation privilege, and thus the extent of discovery completed is more extensive than the stage of proceedings alone might suggest. (Ahdoot Fee Decl. ¶ 12.) Class Counsel thoroughly reviewed materials provided by Sirius XM in advance of mediation, conducted further research and analysis, and consulted with several experts prior to and during Settlement negotiations that lasted multiple months.

Accordingly, Plaintiffs and Class Counsel had sufficient information to make an informed decision about the Settlement and to determine that it represented a favorable and fair result for the Class Members.

## 5. The Recommendations of Experienced Class Counsel Favor Final Approval

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation . . . because parties

represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); *see also Rodriguez*, 563 F.3d at 697 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's outcome in litigation.").

Plaintiffs are represented by attorneys who have extensive experience litigating and serving as counsel in numerous consumer class actions, and other complex matters, including cases regarding unfair business practice claims and false advertising claims. (Ahdoot Fee Decl. ¶¶ 65-75 & Ex. A; Dubanevich Fee Decl. ¶¶ 22-26; Dukelow Fee Decl. ¶ 2 & Ex. A.) Class Counsel identified and investigated the claims in this lawsuit, vigorously prosecuted this action and will continue to do so through final approval. Class Counsel's substantial skill, expertise, and experience were critical to achieving the Settlement here. They fully endorse the Settlement as fair, reasonable, and adequate and in the best interests of the Class. (Ahdoot Fee Decl. ¶¶ 10-17; Dubanevich Fee Decl. ¶¶ 17, 22-26; Dukelow Fee Decl. ¶ 3.)

### 6.  No Presence of a Government Participant

Notice has been issued pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. (2nd Azari Decl. ¶ 9 & Ex. 1.) No governmental entity has intervened.

### 7.  The Class Response Favors Final Approval

The reaction of the Class weighs in favor of the Settlement. Notwithstanding the fact that Notice reached approximately 98.3% of the 853,256 identified Class Members, only 37 persons opted out the Settlement, and only 5 objections were submitted. (2nd Azari Decl. ¶¶ 24-25.) This *de minimus* opt-out and objection rate shows the overwhelmingly positive response to the Settlement. In addition, Class Counsel have communicated with numerous Class Members who contacted Class Counsel with questions regarding the Settlement: all such individuals expressed support for the Settlement. (2nd Azari Decl. ¶¶ 21-23; Ahdoot Decl. ¶ 9.)

### 8.  Lack of Collusion Between the Parties

"Before approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties." *City of Seattle*, 955 F.2d at 1290 (citations omitted). "Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto. Ins. Co.,* No. 08-cv-1365-CW, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010); *see also* 4 Newberg § 11:41; *In re Heritage Bond Litig.*, No. 02-ml-1475-DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005).

Evidence of a settlement negotiation process involving protracted negotiations with the assistance of a neutral mediator also weighs in favor of approval. *Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI-JLT, *slip op*. at *44 (E.D. Cal. July 21, 2015) ("Notably, the Ninth Circuit has determined the 'presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.'") (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011)); *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *15-16 (N.D. Cal. Sept. 26, 2013) ("participation of mediator is not dispositive, but is 'a factor weighing in favor of a finding of non-collusiveness'").

The Settlement is the product of hard-fought, arms-length negotiations between the Parties and their well-qualified counsel. Here, there are no indicia of collusion.

When negotiations began, Plaintiffs had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision regarding the reasonableness of a potential settlement. The Parties engaged in extensive arm's length negotiations, including a full-day mediation session and extensive negotiations after that, with the assistance of Judge West. (Ahdoot Fee Decl. ¶ 28.)

Throughout these negotiations, the Parties were represented by counsel experienced in the prosecution, defense and settlement of complex class actions. Thus,

the Settlement is presumptively fair and reasonable.

## VII.   THE OBJECTIONS

The response of the Class to the Settlement is overwhelmingly positive. As described above, the Notice Plan (which achieved a 98.3% reach) generated thousands of positive responses and 6,210 claims (as of December 11, 2020), but only 37 opt-outs and 5 objections. The objections were interposed by (i) Yves A. Doublette, (ii) Adam R. Klock, (iii) Mark E. Raabe, (iv) Joshua A. Sauberman, and (v) Tim Zeichert. (Ahdoot Decl. Exs. A-E.)

### A.   The Small Number of Objections – Five – Is Compelling Evidence that the Settlement Is Fair, Reasonable, and Adequate

The number of class members that object to a settlement generally is considered in determining whether the settlement is fair, reasonable, and adequate. *Mandujano v. Basic Vegetable Prods. Inc.*, 541 F.2d 832, 837 (9th Cir. 1976). "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. at 529; *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013) (same); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (same); *see also Hanlon*, 150 F.3d at 1027 ("fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"). The substance of each objection here is addressed below. Aside from their lack of merit, however, the small number of objections is another indication that the Settlement is fair, reasonable, and adequate.[9]

---

[9]   An extensive empirical review determined that the average number of objections to settlements of consumer class actions is 233. Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1550 (2004) By any measure, the number of objections received here is remarkably low.

### B. The Objections Are Without Merit And Should Be Overruled

Though Class Counsel appreciate the comments made by the objectors, respectfully, all objections lodged against the Settlement are without merit, based on incorrect facts, comprise of opinions and conclusions, provide no legal authority, and should be overruled.

### 1. Objections That The Settlement Is Somehow Inadequate Have No Merit Because The Settlement's Benefits Are Excellent And Certainly Fair, Reasonable, And Adequate

Though seemingly discrete to each person's circumstances, all of the objectors here essentially argue that the Settlement's consideration is not sufficient.

- Klock objects on the basis that the "satellite radio programming content currently being delivered to lifetime subscription holders such as [Klock] does not comply with the initial lifetime subscription product offering." Klock asks to "mandate restoration of lifetime subscriber access (via radio and online) to any and all Sirius XM programming currently available, which also existed at any point during which the lifetime subscription product was offered." (Ahdoot Decl. Ex. B (Klock) at p. 1.)

- Zeichert objects that he is not "receiving the subscription package I agreed to and paid for" and requests that counsel "clarify the language" of "Paragraph 66(a)" of the Settlement Agreement "to provide for Sirius Lifetime Subscribers a return to their original programming." (Ahdoot Decl. Ex. E (Zeichert) at p. 2.)

- Doublette is likewise unsatisfied with the relief provided by the Settlement. (Doublette at p. 1) ("This Settlement . . . does not satisfy me."). Doublette thinks that "[n]ot even the $100 payment is good enough" because he "paid $789.49 for the Lifetime Subscription and was never told that the subscription was not for [his] lifetime." Doublette also complains that he has been paying $22.11 per month since 2013, while holding a lifetime subscription." Doublette requests to be reimbursed $10,000 for the payments made and that his subscription be transferred "at no charge." (Ahdoot Decl. Ex. A (Doublette) at p. 1.)

- Raabe objects to the Settlement "in part."[10] Raabe argues that "members are still required to pay a transfer fee – albiet a lower fee than originally stated" and

---

[10] Raabe states: "The objectionable portion of the Settlement is the absence of the Court's review regarding possible violation of consumer protection laws by the Defendant, Sirius XM Radio Inc., …."(Ahdoot Decl. Ex. C (Raabe) at p. 2.) Raabe does

that under the Settlement's terms, "Defendant simply agrees to provide subscriptions members 'most' of the services that were originally advertised." (Ahdoot Decl. Ex. C (Raabe) at p. 4.)

- Sauberman argues that (i) the "agreement unjustly enriches the Defendant. Defendant failed to disclose the existence of any transfer fee at the time of subscription; having provided no written agreement upon purchase. Further, Defendant downgraded the number of channels lifetime subscribers would receive when it introduced subscription packages...;" and (ii) the settlement does not include "injunctive relief or prospective assurances[]" and "reduces the improper assessments of similar surcharge to simply a cost of doing business for Defendant." (Ahdoot Decl. Ex. D (Sauberman) at p. 1.)

*First*, all of these objectors were provided subscriber agreements at the time of their purchase. (Donnelly Decl. ¶¶ 8-16 and Exs. A-E.) All were uniform in stating that programming is subject to change (*see e.g. supra* Sec. II.A.) and all stated that Sirius XM would charge a $75 fee upon transfer from one Device to another. (*Id.*; Donnelly Decl. Exs. A-E.) None of the objectors address the terms of the subscriber agreements, or the fact that the Court enforced such terms in *Wright*. Given such provisions, complaints that the Settlement does not include original programming or a transfer fee albeit a lower one are not substantiated or valid.

*Second*, programming for the Lifetime Subscriptions (as well as for all subscribers) has changed, with new stations being added since these objectors purchased their subscriptions and with licensing requirements. (Donnelly Decl. ¶¶ 3-6.) Subscribers now, for example, can enjoy the Beatles Channel, as well as other programming opportunities (at various times, moreover, Sirius XM has made available programming on an interim basis, for example, a Billy Joel channel, *etc.*). (*Id.*) In the event the Settlement forced the same programming available when Class Members first purchased their subscriptions would result in less programming and does not take in to account the alleged terms and conditions of the agreement this Court enforced.

---

not address the procedural history or legal merits of the Litigation or identify the consumer protection laws he claims were not reviewed.

*Third*, this case challenges Defendant's refusal to honor Lifetime Subscriptions for the life of Class Members—an issue that was in dispute given alleged promises made in marketing of the subscription and some contractual language. The actions did <u>not</u> challenge Sirius XM's alleged contractually-disclosed ability to modify Sirius XM's satellite radio programming or channel offerings/line-ups in ways that, Sirius XM believed, enhanced the overall programming for all of its subscribers. Thus, Klock and Zeichert's objections as to Sirius XM's ability to change its programming (in particular, that certain channels previously included in their respective subscriptions prior to the Sirius and XM Radio merger were not carried over after the merger)[11] are not the subject of this Settlement, and do not undermine its fairness.

Lastly, Sauberman argues that "there is nothing in this agreement that prevents Defendant from engaging in this activity in the future (i.e. no injunctive relief or prospective assurances)." Sirius XM, however, no longer offers lifetime subscriptions. Beyond that, the Settlement obligates Sirius XM to "amend its Customer Agreement to reflect that Class Members with a Lifetime Subscription shall be entitled to transfer their Lifetime Subscriptions an *unlimited* number of times," and to "not charge any fee for any transfer of a Lifetime Subscription that exceeds" $35 per transfer. (SA ¶ 66.) The Settlement Agreement recites that "[e]ach Party represents and warrants that he, she, or it intends to be bound fully" by the terms of the Settlement (SA ¶ 100), and there is no reason to expect otherwise after final approval.

Here, all material terms of the Settlement, i.e. the Settlement relief, were negotiated at arm's length, and were already found by this Court to be substantial "given the obstacles and inherent risks Plaintiffs face with respect to their claims." (Prelim. App. Order, ECF 75 at p. 10.)

---

[11]    (Klock: "Programming removed from lifetime subscriber access included, but was not limited to, "NFL Radio" (current channel 88) and was the primary reason for my purchase of the XM Radio products."); (Zeichert: "The sole reason I decided to subscribe to Sirius instead of XM was because of the contract Sirius has with the NFL …. It was Sirius Radio's contract with the NFL alone that persuaded me to become a Sirius Lifetime Subscriber.").

While it is easy for someone to come and critique a settlement after the parties have reached a hard-fought compromise, a settlement need not be ideal in order to be approved. The mere fact that the benefits provided under the Settlement "does not satisfy" all class members or only compensates them for "most" but not all their damages, does not provide a sufficient basis upon which to conclude that the settlement agreement is unfair. *Hanlon*, 150 F.3d at 1027 ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate. Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion").[12]

These objections also appear to misperceive the Court's role at this stage: the Court may grant or deny approval of the Settlement, not revise its terms. Manual for Complex Litigation (4th) § 21.61 (2004) ("The judicial role in reviewing a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement.").

Finally, all objectors had an opportunity to opt out of the Settlement. "Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms." *Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-cv-09405-CAS, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014)

---

[12]  *See also, e.g., Browne v. Am. Honda Motor Co.*, No. 09-cv-06750-MMM-DTB, 2010 WL 9499072, at *18 (C.D. Cal. July 29, 2010) ("While the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any ... settlement of the claims of a class of more than 740,000 members would achieve such a result. Despite the reasonable concerns raised by the objectors, the settlement represents a compromise that fairly compensates class members who chose to remain in the class"); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068-MMC, 2007 WL 221862, at *6 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331 F. App'x 452 (9th Cir. 2009) ("Settlements by their very nature are not intended to provide full compensation for the claimed losses and consequently cannot be calculated with the same precision as actual damages"); *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) ("As our precedents have made clear, whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court" (citation omitted)).

(collecting cases); *Amador v. Baca*, No. 2:10-cv-1649-SVW-JEM, 2020 WL 5628938, at *5 (C.D. Cal. Aug. 11, 2020) ("To the extent that these individuals feel that this settlement is inadequate, their proper remedy would be to opt-out, as a small number of other class members have done…."); *Milligan v. Toyota*, No. 3:09–cv–05418–RS, *slip op.* at 13 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class settlement, noting that objectors "could have simply opted out"). Thus, to the extent a Class Member was not satisfied with the benefits of the Settlement, they were free to opt out.

When the benefits of the Settlement are compared to the risks of zero gain, added expenses, and time and effort associated with continued litigation, it becomes clear the Settlement merits final approval and objections based on inadequacy of the Settlement's terms or consideration should be overruled.

## 2. Notice To The Class Satisfies Due Process, the FRCP, And Was Executed In Accordance With The Court's Order

Sauberman also challenges the notice in this case based on incorrect understanding of the Notice Plan stating that "[c]onsidering recent disruptions to the United States Mail, notice should also have been conveyed by electronic mail to class members." Sauberman argues that this violates FRCP Rule 23(c)(2). This argument is clearly without merit.

*First*, direct notice of the Settlement was provided by email (with follow up physical US Mail for "bounced" emails) to every Class Member that Sirius XM identified in its records. (2nd Azari Decl. ¶¶ 11-12.) This Notice was also augmented by an internet notice campaign and publication. (*Id.* ¶¶ 19-21.) Overall, Notice reached 98.3% of the Class. (*Id.* ¶¶ 8, 13, 31 (Federal Judicial Center, "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010) (recognizing the effectiveness of notice that reaches between 70 and 95 percent of the class)).) For example, Epiq sent an Email Notice to Sauberman on August 28, 2020, which was returned as undeliverable. Epiq then sent a Postcard Notice to Mr. Sauberman, which was not returned as undeliverable. (2nd Azari Decl. ¶ 25.)

FRCP Rule 23(c)(2) provides in relevant part: "…the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." The Notice Plan here precisely complied with this Rule. The Court-approved Notice Plan effectuated in this case was the best notice practicable and complied with due process as this Court has already found in the Preliminary Approval Order. (ECF 75 at pp. 16-17.)

### 3. The Requirements for Objecting Are Fair

Sauberman objects to the objection procedures approved by the Court. He argues: "The process for objecting is quite onerous.  The long form notice requires that objections be sent to …[Epiq, Class Counsel, and Defense Counsel]. It is unlikely most Settlement Class Members will know to look at the Settlement Agreement itself to locate such addresses, thereby discouraging objections." Sauberman, however, misrepresents the contents of the long form notice which sets out each the addresses where objections should be sent. (2nd Azari Decl. Ex. 4, Long Form Notice ¶ 23.) This objection is without merit and should be overruled.

The Court's Preliminary Approval Order set forth the relevant objection procedures (ECF 75 at p. 6), which were disclosed in the Notice disseminated to Class Members. (2nd Azari Decl. ¶ 33 & Ex. 4.) The requirements imposed on objectors are consistent with Rule 23, are common features of class action settlements and are routinely enforced. *Beaver v. Tarsadia Hotels*, No. 11-cv-01842-GPC-KSC, 2017 WL 2268853, at *7 (S.D. Cal. May 24, 2017) (requiring class members to serve objections on counsel for plaintiffs' and defendants); *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-cv-04062-LHK, 2017 WL 399221, at *4 (N.D. Cal. Jan. 19, 2017) (approving procedure requiring objections to be mailed to the addresses provided in the Notice).

Though Class Counsel appreciate the comments made by the objectors, respectfully, the five objections lodged against this Settlement are without merit. As

noted above, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *Officers for Justice*, 688 F.2d at 624. The relevant question is "not whether the final [settlement] could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. While this Settlement may not have obtained the absolute maximum relief available under the law, settlements rarely do because they are compromises. The relevant standard is whether the Settlement is "fair, adequate and reasonable" which this Settlement meets. Thus, the Objections should be overruled.

## VIII. CLASS ACTION TREATMENT IS APPROPRIATE FOR THIS SETTLEMENT

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy[.]" *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). In its Preliminary Approval Order, the Court found that the Class could be certified as defined in ¶ 33 of the Settlement Agreement and that the proposed Settlement Class met the requirements of notice. (ECF 75, pp. 12-17.) In doing so, the Court found that the Settlement Class Representatives satisfied both Rule 23(a) and (b)(3) requirements, and that Settlement Class Counsel were adequate representatives of the Class. (*Id.*) As demonstrated below, there is no reason for the Court to depart from its previous conclusion that certification of the Class is warranted, and no party argues otherwise.

### A.  This Action Satisfies the Requirements of Rule 23(a)

#### 1. The Class is Sufficiently Numerous

Rule 23(a)(1) is satisfied when "the class is so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is generally satisfied when the class exceeds forty members. *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). "A specific minimum number is not necessary, and [a] plaintiff need not state the exact number of potential class members." *Richie v. Blue Shield of Cal.*, No. 13-cv-2693-EMC, 2014 WL 6982943, at *15 (N.D. Cal. Dec. 9, 2014) (class of 140

members meets numerosity requirement). Here, the Class includes approximately hundreds of thousands of members dispersed across the United States. The sheer size and distribution of the Class renders joinder impracticable. *Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) ("Joinder of 1,000 or more co-plaintiffs is clearly impractical."). Numerosity is established.

### 2. There Are Common Questions of Both Law and Fact

Rule 23(a)(2) "conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Courts routinely find commonality where the class' claims arise from a defendant's uniform course of conduct. *Spalding v. City of Oakland*, No. C11-2867 TEH, 2012 WL 994644, at *3 (N.D. Cal. Mar. 23, 2012) (finding commonality where plaintiffs "alleged a common course of conduct that is amenable to classwide resolution").

Here, there are many common issues of law and fact that affect the Class uniformly and satisfy the commonality requirement, including: Whether Sirius XM breached its contract; the terms and conditions covering Defendant's sale of Lifetime Subscriptions to Class Members; Defendant's communication of those terms to Class Members; Defendant's representations concerning its Lifetime Subscriptions; and whether Class Member's claims are subject to individual arbitration. Accordingly, Rule 23's commonality requirement is satisfied here.

### 3. The Class Representatives' Claims Are Typical of Other Class Members' Claims

"Rule 23(a)(3) requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). "Like the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). "The test of typicality is

'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012). Plaintiffs' and Class Members' claims arise from the same nucleus of facts and are based on the same legal theory: whether Defendant's conduct with respect to the Lifetime Subscriptions was unlawful. Typicality is therefore satisfied.

### 4. Class Representatives and Class Counsel Fairly and Adequately Protect the Interests of the Class

Finally, Rule 23(a)(4) requires "the representative parties [to] adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts engage in a dual inquiry to determine adequate representation and ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other Class Members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. As the Court noted, there are no conflicts of interest here, as their claims are coextensive with those of the Class Members, both Active and Inactive Subscribers. (ECF 75 at p. 14.) Plaintiffs seek the same remedy as all Class Members: relief to address claims arising from Sirius XM's sale of lifetime subscriptions. Plaintiffs' interests are perfectly aligned with the interests of the Class. Further, proposed Class Counsel have extensive experience litigating and settling class actions, including false advertising, breach of contract, and unlawful business practices claims on behalf of consumers. They have demonstrated expertise in handling all aspects of complex litigation and class actions and are well qualified to represent the Class. (*See generally* ECF 83-1, Ahdoot Fee Decl.; ECF 83-2, Dubanevich Fee Decl.; ECF 83-2, Dukelow Fee Decl.)

### B. The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied

In addition to the requirements of Rule 23(a), the Court must find that the provisions of Rule 23(b) are satisfied. The Court should certify a Rule 23(b)(3) class

when: (i) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This case satisfies both the predominance and superiority requirements.

### 1. Common Issues of Law and Fact Predominate

To satisfy Rule 23(b)(3), Plaintiffs must demonstrate that "common questions 'predominate over any questions affecting only individual [class] members.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of [the] claim is susceptible to classwide proof.")

Here, the Complaint alleges a common law breach of contract cause of action for the nationwide class. The Complaint alleges that Sirius XM did not honor the terms of the Lifetime Subscriptions it sold to all Class Members. These common issues of law and fact include: the terms and conditions covering Sirius XM's sale of Lifetime Subscriptions to Class Members; Sirius XM's communication of those terms to Class Members; and whether Sirius XM breached the terms of its agreements regarding Lifetime Subscriptions.

Whether Defendant breached a contract with the Class Members—the sole cause of action in the Complaint—is a straightforward legal question that is common to all Class Members. Indeed, even if all fifty states' law applies to the respective residents of those states, this question still predominates because the elements of this cause of action do not vary state-by-state in any significant respect. (ECF 69-1, Ahdoot Prelim. Decl. ¶ 24 and Ex. A, 50-State survey of breach of contract law).

### 2. Class Treatment Is Superior in This Case

Finally, under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court evaluates whether a class action is a superior method of adjudicating plaintiff's claims by evaluating four factors: "(1) the interest of each class member in

individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

Each of these factors supports certifying the Class for settlement purposes. There is little interest or incentive for Class Members to individually control the prosecution of separate actions. The Class Members' individual claims are too small to justify the potential litigation costs that would be incurred by prosecuting these claims individually. Although Plaintiffs claim an injury resulting from Defendant's conduct, the cost of individually litigating such a case against Defendant would far exceed the value of any relief that could be obtained by any one consumer. This fact strongly warrants a finding that a class action is a superior method of adjudication. A class action also would be superior because concentrating this litigation in one forum would not only prevent the risk of inconsistent outcomes but would "reduce litigation costs and promote greater efficiency." *Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482, 493 (C.D. Cal. 2006).

In evaluating the Settlement this Court already found that a class action is superior to other available methods for the fair and efficient adjudication of this controversy, because "the judicial economy achieved through common adjudication undoubtedly makes a class action superior to any alternative procedures for resolving the claims" of millions of class members. (ECF 75.) This remains true for the Settlement, which encompasses a Class of hundreds of thousands (ECF 68), satisfying Rule 23(b)(3)'s superiority requirement.

## IX.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion be granted.

1   Dated: December 18, 2020             Respectfully Submitted,

2

3                                        **AHDOOT & WOLFSON, PC**

4                          By:   */s/ Robert Ahdoot*

5
                                 Tina Wolfson
6                                *twolfson@ahdootwolfson.com*
                                 Robert Ahdoot
7                                *rahdoot@ahdootwolfson.com*
8                                Theodore W. Maya
                                 *tmaya@ahdootwolfson.com*
9                                Bradley K. King
10                               *bking@ahdootwolfson.com*
                                 2600 West Olive Avenue, Suite 500
11                               Burbank, California 91505
12                               Tel: (310) 474-9111; Fax: (310) 474-8585

13
                                 Cornelius P. Dukelow
14                               (admitted *pro hac vice*)
                                 *cdukelow@abingtonlaw.com*
15                               **ABINGTON COLE + ELLERY**
16                               320 S. Boston Avenue, Suite 1130
                                 Tulsa, Oklahoma 74103
17                               Telephone & Facsimile: (918) 588-3400
18
                                 Keith S. Dubanevich
19                               (admitted *pro hac vice*)
20                               *kdubanevich@stollberne.com*
                                 **STOLL STOLL BERNE LOKTING & SHLACHTER**
21                               **P.C.**
22                               209 SW Oak Street, Suite 500
                                 Portland, Oregon 97204
23                               Telephone: (503) 227-1600
24                               Facsimile: (503) 227-6840
25
                                 *Attorneys for Plaintiffs and Class Counsel*
26

27

28

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT